## Case No. 5,424.

### GILES et al. v. The CYNTHIA.

[1 Pet. Adm. 203.] [1]

District Court, D. Pennsylvania.　1801.

SEAMEN'S WAGES — WRECK OF VESSEL — PORT OF DELIVERY.

The seamen shipped for a trading voyage, and the vessel was wrecked on her passage to Jamaica from Honduras.　Their claim for wages was opposed on the ground that Honduras was not a port of delivery, and that the freight to be earned depended on the arrival of the vessel at Jamaica.　Wages decreed to Honduras, as a port of delivery.　Claim suspended as to residue.

[Cited in The Saratoga, Case No. 12,355; Thompson v. Faussat, Id. 13,954; The Two Catherines, Id. 14,288; Bronde v. Haven, Id. 1,924; Reed v. Hussey, Id. 11,646; Pitman v. Hooper, Id. 11,186; The Massasoit, Id. 9,260; Stone v. The Relampago, Id. 13,486; Farrell v. Mayers, Id. 4,685; Hart v. Shaw, Id. 6,155; The Main v. Williams, 152 U. S. 129, 14 Sup. Ct. 487.]

[Cited in Gookin v. New England Mut. Marine Ins. Co., 78 Mass. 516 (12 Gray, 516); Benson v. Atwood, 13 Md. 53; Cole v. Union Mut. Ins. Co., 12 Gray, 516.]

[See Adams v. The Sophia, Case No. 65.]

An American vessel had shipped her hands in Philadelphia, for what is called a trading voyage, having as usual cleared out for the "West Indies" or elsewhere, and to return to Philadelphia. She went to several ports, and finally was wrecked on her way to Jamaica from the Spanish continental possessions, after having been at a port which was at first alleged not to be a port of entry, or place of delivery of a cargo. But it turned out that a regular custom-house was there established, and the ship there paid port charges, and passed through the usual forms. The object of the last voyage was to load with woods, and other productions of that coast. The only question before me was how far the demand of the seamen should extend. The wages were claimed to the time of the loss of the vessel, as it was said, enough had been saved to pay them. The owners and captain alleged, that all the wages were lost with the wreck. They denied that the port on the Spanish Main was a port of

---

[1] [Reported by Richard Peters, Jr., Esq.]

delivery, though it appeared that some goods, part of the cargo, or captain's adventure, he being a part owner, which were not salable at Jamaica, had been carried to the Main, and at this port disposed of. The case of Hernaman v. Bawden, 3 Burrows, 1844, was relied on to shew that it was an entire voyage, though some small matters had been delivered at the Spanish port. It was insisted on in argument, that this was no more a delivering port than Newfoundland, which is settled by the British case not to be so. And a voyage for woods, &c. on the Spanish coast, is in its consequences as to wages, the same as one for fish to Newfoundland. Where no cargo is delivered, no freight is earned; and no wages can be payable, where no freight is earned, as the latter is the fund to discharge the former. Vessels go with salt and casks to Newfoundland, which gradatim, as the fish are caught, are sent on shore, and of course delivered, to cure and enclose them. No more was done in the present case, than to put on shore some provisions, though these were disposed of, to furnish means for the progress of the ship.

. BY THE COURT. There can be no doubt of the principle that wages are due to seamen in cases of capture or wreck, to the last port of delivery, and for half the time the vessel stayed there. This is settled law in this court. The wages for the interval, after the vessel leaves her last port of delivery to the time of the wreck depend on circumstances. The sailors must assist in saving the ship and goods, or so much thereof as possible, so as to entitle them by way of encouragement, to their wages out of the property saved. Laws Oleron, art. 3; "Les Us et Coutumes de la Mer," 8. But there is no question here to induce me to go into this part of the case minutely. The only point seems to be whether the Spanish port was one of delivery, in legal contemplation, under the circumstances of this case. I do not see the bearing of the case in 3 Burrows on the present cause. The voyage, in that case, was, in fact, from England to Spain, with a load of fish, to be taken off the banks of Newfoundland; where the ocean, and not a port of delivery, afforded the prey, which was to be caught by the ingenuity and labour of the crew, and which was then to compose the cargo. The salt and casks were the means of preserving and enclosing, after the fishing-lines and tackle had been employed to take and secure the object of the voyage. These (the salt and casks) were used in and about the cargo, and re-shipped in the vessel, with the cargo, of which they were part, on the further prosecution of the voyage. Of course, there had been no delivery, or any contemplated sale or purchase; the voyage being, in its nature and object, entire. Whaling and sealing voyages, and those on coasts where the cargo is to be obtained in a similar way, and not at a port of usual entry, as

an article of traffic or purchase,[2] are to be considered in a similar predicament. Possibly a voyage to cut wood, and reclaim it from a state of nature, though on land which was not here the case, might be compared in its principles, to the case in Burrows.

I think the force and true meaning of "freight" has been much misconceived. It is a technical expression. It does not always imply that it is the naulum, merces, or fare, for the transportation of goods. It is applied to all rewards, hire or compensation, paid for the use of ships; either for an entire voyage, one divided into sections, or engaged by the month, or any period. It is also called "freight" (and it is to be determined on the like legal principles) in the case of passengers, transported in vessels, for compensation. Howland v. The Lavinia [Case No. 6,797]. In Saxon, from which much of the English language is derived, it is called "fracht," whether it be a compensation for transportation in ships by sea, or carriage by land, either of goods or persons, in gross, or detail. Many of the commercial terms, as well as the laws and customs of the sea, are derived from the Saxons, who were, for a great length of time, the most extensively commercial and nautical people of Europe. There can be no distinction in reason and law, whether this freight, or hire, be actually paid by one, for the use or chartering of the vessel of another; or whether he sends his own vessel for, or with a cargo, to a designated port: which cargo is to be obtained by funds or credit there, or goods, money, or bills, sent in and with the ship. The services of the seamen entitle them to their wages, for that portion of the voyage they have so far completed. A port of destination, it will be seen, is, in this respect, the same as a port of actual delivery. And it matters not that the vessel did not carry thither any goods; but went in ballast. She earns her freight, and the wages are due out of it, as much in legal contemplation, as if she had been fully laden. So is it if she be partially laden, as in this case. Was it ever known that wages were apportioned, according to the quantum of cargo the merchant chooses to ship? Why then should it depend on there being no cargo—but money, bills, or credit, to obtain a cargo, for the further prosecution of her voyage. If a merchant sends the vessel of another for cargo, to a

---

[2] A ship went from the United States to the N. W. coast, for furs, ultimately destined for Canton. The seamen shipped by the freight; i. e. they were entitled to a certain portion of the freight earned. I held this to be an entire voyage, from the United States to Canton. The vessel was not successful in obtaining a full cargo on the coast: having arrived out of season. She called at a port, on her way to Canton, where skins had been left by a vessel not fit to proceed. These skins were carried on freight, to Canton, and the cargo thereby completed. I considered the seamen entitled by the contract to a proportion of the whole freight; as well on the furs obtained on the coast, as on those taken at the intermediate port.

designated port, and obtains none (vide Lex Mercatoria; Beawes, 110, 111; 2 Vern. 212), he who hired the ship must pay "empty for full." [3] Why then should the case of the sailor not depend on the same principle, and have the same measure meted to him? both in the case of the vessel sent by the owner, and that of one chartered? And there can be no difference in principle, whether the vessel go empty to a destined port for a cargo, or return under disappointment, without one. Most of the cases, in which the law is settled, for payment of wages to ports of delivery, and for half the time of stay at them, are those of vessels on India voyages. Now it is well known, that the inward cargoes, according to the course of trade, both in Europe and in this country especially, are generally obtained with specie, sent for their purchase or credit obtained there. In China this is particularly the case—a small portion of cargo is sent to comply with regulations insisted on at Canton, but very inadequate to the purchase of that in return. It appears then clear to me that any port of destination where cargoes are obtained in a course of traffic, either with money, credit, barter, or any means (not such as I have first stated), is a port, technically, and to legal intent, of delivery. So are they, though as before-mentioned, disappointments in obtaining cargoes occur, so far as they relate to wages earned by, and payable to mariners. Agreements made with them contrary to this position, whereby they bind themselves not to demand wages, until the return of the vessel to the port of outfit, have been held, even in chancery, void; as may be seen in the case of Edwards v. Child, 2 Vern. 727. [4] Thus far does the law extend its protection to this principle.

---

[3] Near 40 years ago, in my outset at the bar, I brought indeb. assump. for money had and received, &c. against the master of a ship, for 90 guineas paid, in advance, by a gentleman, for himself and others, who took the cabin, and agreed for their passages, from an out port of England to Philadelphia. The day for going on board had been fixed by the parties. The passengers loitered on their route from London; and did not arrive at the port appointed until the ship had departed. The case turned out to be as before stated, though conceived by my client to be otherwise, as to the day fixed. Such of the cabin stores as were in preservation, and laid in by the passengers, were returned. I failed in the cause. The passage-money was held to be legally retained, among other reasons, on the principle mentioned in the above case, i. e. that freight it earned "empty for full," when the disappointment is owing to the misfortune or neglect of the freighter, and no laches are imputable to the master or owner of the ship. In this case it appeared that the wind, which had been adverse, veered to a point favourable to the ship's departure from the Downs; and afforded an opportunity which could not, at that season of the year, be justifiably neglected. She had waited three or four days after that agreed on.

[4] See the notes of decisions in the Maryland district, by the late Judge Winchester,—Relf v. The Maria [Case No. 11,692, note].

I therefore direct the wages to be paid [5] to the bay of Honduras, as the last port of delivery, and let the fate of the subsequent wages be determined, by the circumstances attending the wreck; into which I will enquire, if requested so to do.

---

GILHAM (WELFORD v.). See Case No. 17,376.

---

[5] Several cases, similar in the leading circumstances, have been determined on the same principles. One, a case of capture and condemnation for unneutral conduct. The cause of the loss of the ship, whether by capture or wreck, has no operation upon the principle. In some of the causes, cargoes were obtained in whole or in part; in others, disappointments occurred. It was probable that in all the cases, an illicit trade had been carried on or attempted, but no objections were made on this account.