Parker, C. J.
Several questions have presented themselves in this case, of somewhat difficult solution; but we are now ready to decide them.
The first respects the duration of the risk; whether it continued to the time when the ship was captured by the French privateer. At that time the year, which was contemplated as the termination of the policy, had expired. But by the terms of the policy, if the ship was at sea when the year expired, the risk was to continue until the voyage should be completed; and an additional premium by the month was to be paid, until the termination of such voyage. At the expiration of the year, the ship was not literally at sea; but was in a British port, whither she had been carried against the will of the master.
*37 Was she then, within a fair construction of the contract, within the intent of the parties, at sea? We think she was. She was absent on a voyage which had been commenced within the time of the original risk. She would have been protected, upon that voyage, to Amsterdam and back again; because within the common meaning of the term at sea, which was undoubtedly adopted by those parties. A vessel is considered in that condition, while on her voyage and pursuing the business of it, although during a part of the time she is necessarily within some port, in the prosecution of her voyage. The intention, in prolonging the risk beyond twelve months, was unquestionably to give the ship protection under the policy, in case * that time should expire, while the vessel should be employed in some unfinished voyage; and wdiether in a foreign port, or actually upon the high seas, we believe there was no difference in the contemplation of the parties, when the "contract was made.
The policy being in operation at the time of the capture, the next question is, whether the loss happened within any peril insured against. And here we must ascertain what is the loss complained of. It is the capture by a French privateer, on the pretext that the ship had come from a British port, and had been spoken with by British cruisers. This certainly is within the general risks provided against in the policy ; for it was an arrest and detention, and final loss, by the force and violence of subjects of the then emperor of France.
We must therefore consider the exception in the memorandum at the foot of the policy, and see whether, by that, the underwriters are discharged.
This exception is from any loss or expense, arising from the violation of the existing laws or regulations of any of the belligerent powers restricting neutral commerce. At the time of executing the policy, the Berlin decree of the emperor of France was existing; but no other decrees, either of France or Great Britain, were in force, which restricted neutral commerce. Had the vessel been captured under that decree, the underwriters would have been discharged. But upon examination of that decree, we do not find any of its provisions, which would have subjected this vessel to capture. Ft does not appear that she had articles of English growth or manufacture on board, or those of her colonies. By the terms of that decree, vessels coming from a British port were prohibited from entry into a port of France or her dependencies; but they were not thereby made liable to confiscation, unless there had been a false declaration of the master or others on board, to evade this article of the decree.
*38 At the time of the capture, the Milan decree was in force, which subjected the ship to capture, if coming * from an English port, or if she had been spoken with by British cruisers. Now, although this vessel would probably have been taken under pretext of the Berlin decree, had the Milan decree not been passed, as the system of plunder was then in full operation, yet as another decree existed, which authorized French cruisers to capture vessels situated like this, we must suppose she was captured under the latter, and not under the former decree. Causa propinqua, non remota spectatur. And by the allegations of the libel, it appears that it was under the last-mentioned decree that the ship was claimed by the captors as prize.
This narrows the question to the point, whether the term existing decrees, as used by the defendants in the exception to their liability under the policy, can by fair construction comprehend the Milan decree. And we should willingly yield to the construction urged for the defendants, if it were consistent with the most liberal use of terms, as they are commonly used by merchants. But it must be considered that the underwriters were, in this respect, making their own bargain, _and inserting their own phraseology; the object being to secure themselves, by the exception, against a risk, which in the body of the policy they had incurred.
What did they intend to provide against ? Surely against any decrees then in force, whether known or unknown. The ingenuity of the belligerent powers, and particularly of the French emperor, in manufacturing decrees against neutral commerce, was not fore seen, or at least not sufficiently provided .against. At any rate, it was thought enough to secure themselves against any decrees already in force. The Berlin decree had passed, and Was probably heard of, when the policy was effected. It might have been supposed, that a retaliatory or countervailing decree would immediately be made by Great Britain. It was thought sufficient to provide against such decrees as were in force on the twenty-fourth day of December, 1806. Had it been designed to secure against all such decrees * as should be made during the risk under the policy, surely more apt words would have been taken, than those made use of in their memorandum. At any rate, we cannot distort language, so as to make the term existing mean something which is to be made to exist afterwards.
It is thought hard that the defendants should be made liable for a loss happening from means which neither party calculated upon, when the contract was made. But it does not differ from the case of the breaking out of a war, which occasions a capture; when at the making of a policy the most profound peace existed, and there *39 were no symptoms of approaching war. In such a case the underwriter loses, Because he did not guard himself in the policy.
With respect to going into England, and thus exposing the ship to the rapacity of the French, under their monstrous decrees, this appears, hy the statement, to have been wholly involuntary on the part of the master ; and his sailing for Amsterdam was not a violation of duty, because he did not know of the Milan decree; and his permission to sail for Amsterdam from Bristol sufficiently exculpates him on account of the British orders in council. The British ports could not be considered as under blockade, by virtue of the Berlin decree, when there was notoriously no force there to carry it into execution; and a seizure and condemnation on that ground would have been considered a violence not justified by the law of nations. Indeed, the decree itself did not expose vessels to capture for coming from English ports, but only prevented their being received at French ports. It was therefore no breach of duty in the master to leave Bristol and sail for Amsterdam. Although, by the letter of the Berlin decree, his vessel might have been turned away on that account from Amsterdam, yet she was not made liable thereby to capture; and the master might well have supposed that, as he had been carried into the English port by force and constraint, the decree would not be enforced against him.
* It has been said in argument, that the ignorance of the existence of the Milan decree, on the part of the master, does not the less expose the owners to the loss of their insurance; because he sailed from England in violation of the letter of that decree.
But we see it nowhere decided, that a vessel sailing from a neutral country to a blockaded port, or a neutral vessel sailing from the blockaded port of a belligerent, the owners and master having no knowledge of the blockade, thereby becomes liable to be made prize. There may be a presumption of knowledge where a blockade actually exists, which will defeat the excuse of ignorance. But in this case there was not, nor could there be, any blockade of the English ports; and there was nothing from which the knowledge of the master could be inferred, of the exposure of his ship under the Milan decree, except that it had been published in England, before he sailed from thence. But this inference is rebutted by the verdict of the jury.
Upon the whole, we think the loss in this case comes within the policy, according to the fair principles of construction, and not within the memorandum, under which the defendants would shelter themselves.
'Pile premium being stated in the policy at one per cent, per *40 month daring the continuance of the risk, and it being agreed that the amount of it shall be deducted from the sum adjudged to the p'aintiff, it is necessary that we should decide the time for which the plaintiff is held to pay it, under the circumstances of the case; and it is our opinion that the same is recoverable, from the commencement of the risk until the time when the final compromise took place between the captors and the master.