<hr />

## The American Insurance Company *vs.* Hutton.

Where a vessel insured for *twelve calendar months*, and if *at sea* at the expiration of the term,

the risk to continue at the same rate of premium until her arrival at the port of destination commenced (when 120 days of the policy were unexpired) a voyage ordinarily occupying 70 days, and in the course of her passages from place to place sprung aleak so that repairs became necessary, and whilst they were making, the specified term expired, *it was held*, that the insurers were not liable for the loss of the vessel, which happened on her return passage to the port from which she departed when the voyage commenced, she not being *at sea* within the meaning of the policy at the expiration of the specified term.

ERROR from the superior court of the city of New-York. Hutton sued the American Insurance Company on a policy upon the body, &c. of a brig called the *Champion*, for and during the term of *twelve calendar months*, commencing on the 21st January, 1835 ; averages, if any, to be settled each passage ; and if *at sea* at the expiration of the term, the risk to continue at the same rate of premium until her arrival at *the port of destination*. No port of destination is mentioned in the policy ; the language of the policy is : " Beginning the adventure upon the said vessel, tackle, apparel, &c at and from the 21st January, 1835, at noon aforesaid, and so shall continue and endure until the 21st January, 1836, at noon aforesaid, and until she be moored twenty and four hours in good safety." The vessel was valued at $8500, and was insured at a premium of 8 per cent. She sailed from New-York on 23d *September*, 1835, bound on a voyage for St. Barts, Curacoa and Maracaibo, and thence back to the port of New-York. The ordinary length of such a voyage out and home is 70 days. Portions of her cargo were in-
[ *331 ] tended for each of the *places above named. On her voyage out she encountered a hurricane which retarded her so that she did not arrive at St. Barts until the 23d day of *October*. She left there on the 26th, and put into St. Thomas (the nearest port where repairs could be made) on the 28th October. There the master of the *Champion* learnt that the city of *Maracaibo* was in a state of insurrection, and he agreed with the master of another brig, the *Harper*, that if on his arrival at *Curacoa* he should find the intelligence as to *Maracaibo* true, that he would land at *Curacoa* the portion of the cargo intended for *Maracaibo* and return and take the cargo of the *Harper* to Philadelphia or New-York. On the 4th *December*, the *Champion* being repaired, set sail for *Curacoa* and arrived there on the 8th December, and the portion of the cargo destined for that place was discharged ; and the portion intended for *Maracaibo* was landed, the intelligence as to the state of that place being confirmed. On the 20th *December*, the vessel sailed from *Curacoa* for *St. Thomas* for the purpose of taking in the cargo of the brig *Harper*. She did not arrive at St. Thomas until 6th January, having on her passage encountered violent storms. Being very leaky, she was overhauled and it was found that she required extensive repairs, in the making of which she was detained until the 22d day of January, 1836. Having taken in freight, she sailed on the 30th January for New-York, and

on the 18th February, was stranded on the Delaware beach and totally lost. Had not repairs been necessary, she probably would have sailed from St. Thomas on the *seventh* and certainly long before the *twenty-first* day of January. The necessity for the delay at St. Thomas was wholly occasioned by the damage sustained on the passage to the latter place from Curacoa. The repairs were made with all possible despatch. The evidence being closed, the counsel for the defendants insisted that the defendants were protected from liability by the termination of the period of insurance before the loss happened; but the court charged the jury that the risk was not terminated at the time of the loss of the vessel. The counsel for the defendants excepted to the charge, and the jury found a verdict for the *plaintiff for $8694,73; upon which judgment being entered, the    [ *332 ] defendants sued out a writ of error.

*D. Lord, jun.* for the plaintiffs in error.

*G. Griffin,* for the defendant in error.

*By the Court,* COWEN, J.   The policy in question was on time, for a term of one year certain, from the 21st January, 1835, and if the vessel should happen, at the expiration of the year, to be *at sea*, the policy was to continue till her arrival at the port of destination.   At the expiration of the term, the vessel was in fact at St. Thomas, under circumstances which raise the question whether she was in port, or whether constructively *at sea*.   Of course she was not literally at sea.   She had been out to Curacoa, and was returning to St. Thomas, with a view to take and transport the cargo of the Harper to Philadelphia or New York, under the agreement with Capt. Pedrick.   Being accidentally disappointed in this, she put into St. Thomas, where she was detained for repairs.   Otherwise she would have actually put to sea, before the twelve months had expired.   During her detention from necessity, and pursuant to the original intention to proceed from St. Thomas for a port in the United States, she there made arrangements for taking in freight with which, as soon as ready, she sailed for New-York.   In her passage she was lost.

The counsel for the plaintiffs in error contends that St. Thomas was her port of destination, at which she had arrived and lay within the meaning of the policy on the day of the year's termination ; and that she could in no sense be deemed *at sea*.   He admits, however, that the words *at sea* have a secondary meaning ; and there are two cases decided by the supreme judicial court of Massachusetts, which hold that a vessel may, under circumstances, be deemed *at sea* within a clause like this, though in fact lying in port.   *Wood* v. *The Marine Ins. Co.* 14 *Mass. R.* 31.   *Bowen* v. *The*

*Hope Ins. Company*, 20 *Pick.* 275. In the first, a vessel bound
[ \*333 ]   to Amsterdam had been captured while in the course of her pas-
sage at sea, and carried into a British port (Bristol) where
she was when the year expired. The clause, " should this vessel be *at sea*
at the expiration of the above period, (a year,) the risk is to be continued
until her arrival at a port of discharge," was held to attach. Here she
was engaged in the prosecution of her passage, which she actually pursued
so soon as she could obtain a clearance. Parker, Ch. J. who delivered the
opinion of the court, said : " She was absent on a voyage which had been
commenced within the time of the original risk. She would have been pro-
tected on that voyage to Amsterdam and back again ; because within the
common meaning of the term *at sea*, which was undoubtedly adopted by
these parties. A vessel is considered in that condition while on her voyage
and pursuing the business of it, although during a part of the time she is
necessarily within some ˙ port, in the prosecution of her voyage. The inten-
tion in prolonging the risk beyond twelve months was, unquestionably to give
the ship protection under the policy in case that time should expire while
the vessel should be employed in some unfinished voyage ; and whether in a
foreign port or actually upon the high seas, we believe there was no differ-
ence in the contemplation of the parties when the contract was made." In
the last case, the vessel sailed from New-York on a voyage to Rotterdam,
from which place she was to proceed to Bangor, in Wales, for a cargo, and
thence to Boston. The vessel reached Bangor, took on board her cargo, un-
moored, and dropped down several miles below Bangor ; but not being able
to get out of the straits on account of head winds she came to anchor ; and,
though she made sail for several days, did not succeed in getting out of the
straits, and proceeding on her voyage ᵗill after the year expired. The
words of the policy were, that if the vessel should be *at sea*, when the year
expired, then the risk was to continue till her arrival at her port of destina-
tion and discharge. The continuing clause was held to attach, while she
lay confined in the straits, occasionally struggling to escape. The jury
found she was not in a harbor on the day when the year expired.
[ \*334 ]   Another policy which continued \*itself if the vessel should be on
her passage, was also held to attach at the same time, the words
*at sea* and *on her passage*, being considered by the court as synonymous.
The court said the *words* in the policy were used in contradistinction to an
*arrival in port* ; and the decision turned on the vessel having left her moor-
ings, and got ready for sea. This was held equivalent to being on her voy-
age or passage. Shaw, C. J. who delivered the opinion of the court, cited
and approved *Wood* v. *New England Mar. Ins. Co.*ˑ He remarked that,
" if the vessel has sailed or commenced a voyage from one port to another,

she must be considered to be *at sea*, within the meaning of this clause, from the commencement to the termination of the voyage, although during parts of it she may have sought shelter in a place on the way."

In the case at bar, I think the defendant in error is put to contend for something beyond what is established by either of the cases cited, which are the only direct authorities upon which he relies. The first holds that a vessel being in the course of her voyage, diverted into and lying at a port *in invitum*, is still constructively *at sea :* the latter case holds that being unmoored and ready for sea at an intermediate port of destination amounts to the same thing. In the case at bar the vessel had not been forced into St. Thomas from any cause. She proceeded there as to an intermediate port of destination determined on by the master, as a port of lading ; and so far from being ready for sea, she still continued in that port till the year had passed, not having unmoored, but merely engaged in the business of lading. Can a vessel be said to be at sea while lying at an intermediate port of destination, though in prosecution of the business which is to carry her to the ultimate one ? It is true she is on her general trading voyage, acting with a view to proceed and reach her ultimate port. She is on the voyage round, and in this instance the vessel would have been covered by the policy, if found *at sea* upon the 21st of January ; whereas she is lying by and lading on that day in an intermediate port of her own choosing. She had terminated her particular passage. I think the court *below    [ *335 ] must have held that the policy continued till her arrival in the United States, touching at what ports of destination she pleased. But there is nothing in the policy which looks to that. True the voyage in view was a trading rambling voyage, averages were to be settled each passage ; and the vessel departed from New-York, where she lay in September, 1835. The *terminus ad quem* is one year ; the protection to be continued over on *condition*, viz. if at the *terminus* she happened to be *at sea*. She had been delayed by adverse weather, which prevented her being *at sea ;* but such delay was not made a condition. She had been strained, consequently detained in port to be repaired ; but that was not made a condition. The policy was not to be continued for either of these reasons. She was making her arrangement *to go to sea ;* but she had not yet even unmoored, or began to unmoor. She was not *sailing*, and in her course detained by some subsequent occurrence ; and not even ready to sail. *Pettigrew* v. *Pringle*, 3 *Barn. & Adolph.* 514. She was on a voyage round, and, if you please, this was contemplated by the parties, though there is no evidence of it ; but she was not *sailing* on the voyage ; she was not *at sea* on the voyage. The defendants below are not to be made liable on excuses that she could not fulfil the condition. She took that risk, and knew where she must be in order to entitle herself to protection ; *at sea*, open to the hazards of a sea voy-

age, in which case she would be protected only till she reached the port of destination. She asked no more than this ; and the reason, I suppose, was that she wanted no more. On her reaching port her owner could re-insure at his leisure : and at the end of her passage, the insurers were bound, as they did do several times, to settle her averages. It would be drawing out this clause to a most unnatural and immoderate length, to say that it ran the whole round of any voyage the master might have raised in his mind ; one to the East Indies and home, or round the world, covering every stopping place planned out in the way. Thè parties do not appear to have had any definite voyage in their minds ; but only random passages to be [ *336 ] undertaken within the year, and *covering the pending passage in a course of actual prosecution at the terminus. *At sea* was, I think, used in opposition to being *in port*. The words were not used in opposition to her being *at home*. Arriving at *the* port of destination means, I think, any port of destination, whether at home or abroad for lading or discharge, or any other object or business voluntarily pursued. It would seem to be straining construction beyond all precedent, to hold that, being *in port* on her own business and lying there for weeks, is being *at sea*, in the prosecution of a voyage or passage. It is going quite far enough, if not too far, to say with *Wood* v. *The New England Mar. Ins. Co.* that a vessel is *at sea*, while lying even contrary to her will in port, without a clearance. To predicate the same thing of her while lying in her own appointed port sounds like a distortion of language, unless we could suppose some secondary meaning established by commercial usage. None such is in proof.

In examining this case, I have given the testimony its strongest possible bearing in favor of the plaintiff below. I have supposed it clearly established, that the vessel was but touching at St. Thomas for a cargo on her way from Curacoa to New-York. I have disregarded the argument that such a voyage and such a purpose were questionable on the whole testimony, and that, at least, the jury should have been directed to inquire of them. The protest of the master speaks of the voyage as being from New-York to St. Barts, Curacoa and Maracaibo. It says that on failing to obtain the cargo of the Harper, he changed his mind, and determined to return to Curacoa, and proceed thence on his voyage to Maracaibo ; and that he continued to entertain that intention, till the agent on discovering that the expenses occasioned by the repairs had swelled to such an amount as to forbid all farther enterprizes out, peremptorily ordered the brig home. This view is certainly far from strengthening the idea, that she was at sea on a voyage home, or round, when she reached the 21st of January. But admitting that she was, I think, under the circumstances, we must take her to have been constructively [ *337 ] where *she was ostensibly and literally in an intermediate port of destination ; so not *at sea ;* therefore not within the condition.

Utica, July, 1840.—American Ins. Co. v. Hutton.

In any view which can be taken of this case on the bill of exceptions, I think the judgment should be reversed ; a *venire de novo* to issue from the court below, the costs to abide the event.