JOHN COLE & others *vs.* UNION MUTUAL INSURANCE COMPANY. SAMUEL H. GOOKIN *vs.* NEW ENGLAND MUTUAL MARINE INSURANCE COMPANY.

A policy of insurance upon a ship for a year, and, "if the ship is at sea at the end of the year, then to continue at *pro rata* premium until she arrives at her port of destination," terminates when the ship at the end of the year is, or afterwards first arrives, at a place to which she is sent to take in cargo, although it is not a port by law, but an open roadstead, with no haven, harbor or custom house, and is not her final destination.

ACTIONS OF CONTRACT, submitted to the judgment of the court, with authority to make all legitimate inferences, upon statements of facts, in substance as follows :

The *first action* was upon a policy of insurance on the ship William Penn for one year from the 20th of May 1854 at noon, and "if the ship is at sea at the end of the year, then to continue at *pro rata* premium until she arrives at her port of destination."

The William Penn, being at New York, was chartered by her owners to F. Barreda & Brothers on the 16th of June 1854 by a charter party which provided " that the said vessel shall proceed to Callao from San Francisco, California, where she is at present

bound, and being tight, stanch and strong, and in every way fitted for the voyage, shall proceed with all convenient dispatch to the Chincha Islands to take in her cargo ; after completing her loading of guano, the vessel to proceed direct to her destination ; " and " the said vessel shall, after completing her loading as aforesaid, proceed to Hampton Roads, where she is to remain until return of post to receive orders from F. Barreda & Brothers from Baltimore, or their agents, to discharge in any safe port of sea or river, not north of Cape Ann nor south of Hampton Roads, and there, according to bills of lading, deliver her cargo." The ship sailed from New York on the 18th of July 1854 for San Francisco, arrived there on the 25th of December, and delivered her cargo ; sailed thence on the 20th of January 1855 for the port of Callao in Peru, where she arrived on the 25th of March, consigned to the charterers ; cleared from Callao for the United States, with liberty to stop at the Chincha Islands for a cargo of guano ; sailed from Callao, under that clearance, and in execution of the charter party, on the 1st, and arrived at the Chincha Islands on the 7th of April 1855.

At the Chincha Islands there is no port or custom house under the municipal law of Peru, to which they belong, and no clearance can be obtained there, but there are Peruvian government officers there to regulate the shipment of guano. The islands are barren and uninhabited, except by government officials, laborers employed in digging guano, and a few shopkeepers. An English mail steamer stops there twice a month, and there is an office for the receipt and dispatch of letters. There is no harbor ; but vessels come to anchor upon the open coast, in about twenty three fathoms of water, and, having discharged their ballast, take in their cargo of guano, generally from lighters. The anchorage is good, the weather generally pleasant and the sea smooth, and vessels usually send down their top hampers, and are sometimes stripped and painted while lying at the islands ; but at times there is a heavy swell, so that it is impossible to land for several successive days, and vessels sometimes drag their anchors. Vessels carrying guano from the Chincha Islands to the United States always clear from Callao.

The William Penn came to anchor between two of the islands, and took in her cargo by boats from either, as sea and winds would permit; on the 14th of June sailed for Hampton Roads, in the United States, and on the 30th of September 1855, while pursuing this voyage, was totally lost by perils of the sea.

The question submitted to the court was whether the William Penn was " at sea " at the expiration of the year, within the meaning of the policy.

*S. Bartlett & B. R. Curtis,* for the plaintiffs. At the expiration of the policy, the William Penn was " at sea," within the natural and usual meaning of those words. The statutes of the United States, from the origin of the government to this day, have described the " high seas " as being all places within the ebb and flow of the tide, not within " any river, haven, basin or bay." A vessel in an open road may well be found to be on the high seas. *United States* v. *Pirates,* 5 Wheat. 200.

The ship was not in a port at the expiration of the year. It is agreed that the Chincha Islands are not a port according to the municipal law of Peru, and that there was no haven or harbor there. They are not a port, within the definition of that word in the law of the place where the contract was made and is to be executed. " A haven is a place of a large receipt and safe riding of ships, so situate and secured by the land circumjacent that the vessels thereby ride and anchor safely and are protected by the adjacent lands from dangerous or violent winds." " A port is a haven and something more." Hale *de Portibus Maris,* *c.* 2, Hargrave's Law Tracts, 46. 1 Chit. Com. & Manuf. 726. The cases in which " port " in a policy of insurance has been allowed to include an open roadstead are peculiar, and admit that in its general and usual sense it is equivalent to harbor. 1 Duer on Ins. 281.

If the Chincha Islands can be deemed a port, they are not " her port of destination " within the meaning of the policy. The language is not " until she arrives at some port or place," but " at her port of destination " ; implying that some particular voyage has been begun, which is to terminate at some port to which the vessel is destined in that voyage. So far as the char-

ter party can settle it, the Chincha Islands were not that port of destination. The vessel was under a charter party which expressly described and provided for one voyage from Callao to a port of discharge in the United States. So of her clearance, which by the universal usage of the maritime world fixes the ports of departure and destination. She was cleared from Callao to the United States, with liberty to stop at the Chincha Islands. From the moment when thus cleared, she was destined to the United States, in a voyage which was begun at Callao. Stopping at the islands was an incident in the course of that voyage, which no more divides the voyage, and gives the vessel two ports of destination, contrary to the charter party and clearance, than stopping at the Cattegat to pay sound dues, or at a Malay village on the coast of Sumatra to buy pepper, or at the Falkland Islands or elsewhere to catch sea elephants or seals in the course of a whaling voyage, or at different points on the African coast or South Sea Islands on ordinary trading voyages. When the underwriters on a time policy which describes no voyages agree to continue the insurance after the expiration of a year, until the vessel shall arrive at her port of destination, they necessarily leave the owner to fix what voyages shall be made, within the usual limits of commercial adventure, and what shall be the ports of destination in those voyages.

The defendants' construction would enlarge the words "port of destination" into "place of arrival," thus materially changing their meaning. The former refers to the port to which it is intended the vessel shall proceed to terminate her voyage ; the latter includes any place where she may stop for an incidental purpose in the course of her voyage. Touching at a place which is not a port, while in the prosecution of a defined voyage, and as one of the incidents thereof, is not going to "her port of destination." The distinction is like that between a port of arrival and a port of discharge, which is firmly settled, even where the vessel goes to the port of arrival for the purpose of discharging her cargo, and there takes on board cargo. *Coolidge* v. *Gray,* 8 Mass. 527. *Lapham* v. *The Atlas Ins. Co.* 24 Pick. 1. *King* v. *Hartford Ins. Co.* 1 Conn. 333.

This provision in the policy should be liberally construed in favor of the assured, as most conducive to the interests of commerce, and most consonant with what must be presumed to have been the intention of the parties ; 1 Duer on Ins. 161 & cases cited; especially as the extension of the time during which the risk was to continue was accompanied by a corresponding increase of the premium, and there is no ground for supposing that the underwriters would have had any preference for the termination of the policy at the first place where the vessel might touch in the course of her voyage; while the interest of the owners would clearly be to have their vessel covered until her arrival in the United States under the charter party.   The object of the clause was to preclude inquiry into the questions whether the place touched at might be a place of safety, or one from which the owner might receive timely advice, and to enable the owner, in making new insurance, to contract with an intelligent view of the state and position of his ship.

The doctrine of this court on the subject has been expressed in the following terms : " A vessel is at sea, within the common meaning of the term undoubtedly adopted by the parties, while on her voyage and pursuing the business of it, although during part of the time she is necessarily within some port, in the prosecution of her voyage.   The intention in prolonging the risk beyond twelve months was unquestionably to give the ship protection under the policy, in case that time should expire while the vessel should be employed in some unfinished voyage, whether in a foreign port or actually upon the high seas." *Wood* v. *New England Marine Ins. Co.* 14 Mass. 36.   It is important that the rule thus laid down should be adhered to.   The New York and Pennsylvania cases exhibit no uniformity of judgment, opinion or reasoning, and no satisfactory enunciation of the grounds on which the decisions are made to rest, and have nothing in their facts to make them conflict with *Wood's case.*   *Hutton* v. *Utica Ins. Co.* 24 Wend. 330, and 7 Hill, 321.   *Union Ins. Co.* v. *Tysen,* 3 Hill, 118.   *Eyre* v. *Marine Ins. Co.* 6 Whart. 247, and 5 W & S. 116.

*J. H. Clifford,* for the defendants.

The *second* action was upon a policy of insurance on the ship Waterwitch for one year from the 27th of May 1854 at noon, and "if at sea on the expiration of the year, risk to continue at *pro rata* premium until her arrival at port of destination."

On the 23d of April 1855, the Waterwitch being at San Francisco, the captain chartered her "from San Francisco to the port of San Blas, in Mexico, there to pay her tonnage duties, and getting a license to load Brazil wood at Ypala to proceed to the latter port or place, there to take a full cargo of Brazil wood and proceed direct to New York, or Boston, at the option of Don Juan Jose Castanos," who was the agent of the charterers, and to whom the ship was consigned at San Blas. The ship left San Francisco on the 1st of May 1855, seaworthy in every respect, and arrived at San Blas on the 9th, where the captain entered and cleared her and paid her port charges, having a certificate of privilege to stop at Ypala for a cargo of Brazil wood. She left San Blas on the 16th of May, arrived at Ypala on the 19th, began to take in cargo on the 21st, and proceeded in loading till about the 30th. On the night of the 31st it began to blow heavily, the wind blowing directly on shore. On the 1st of June the wind and sea increased with violent squalls, and the ship went upon the rocks and became a wreck. Within twenty four hours afterwards, the captain went before the local judge at Ypala, and noted a protest abandoning the ship for a total loss.

The district of Ypala is off the western coast of Mexico, between San Blas on the north and Acapulco on the south. San Blas, Altala, Mazatlan and Acapulco are the only ports of entry and clearance on the whole coast; and vessels do all their custom house business at one of those ports, principally at San Blas, and cannot go to Ypala without going to one of those ports to enter and clear, pay their port charges, and get a license to go to Ypala for Brazil wood, the receiving of which by the vessels there is the only trade of the place. Ypala was called a "port" in the protest, and is sometimes so called in the licenses to take wood; but the coast is entirely open to the sea, and patched with rocks in some places; and there is no haven or harbor, nor pilots, nor light-house or breakwater or anything of the kind, nor

custom house, nor American consul or resident agent. The whole country around is known by the name of Ypala, and the village or settlement of Ypala is composed of two houses, and forty or fifty huts inhabited by Indians, who load the Brazil wood in canoes which they launch through the surf on the beach, when a smooth opportunity offers, and paddle to a launch lying just outside of the ship, from which it is received on board. Ships receiving Brazil wood lie about a quarter of a mile from the shore, and occasionally purchase a few supplies from the natives, but do not go there for the purpose of unloading any cargo.

The master of the Waterwitch and others testified, subject to objection to the competency of their testimony, that Ypala is an open roadstead, entirely open to the sea ; that the holding ground at Ypala is bad, the bottom sandy; and a ship lying there at anchor is in every way at sea, and as much exposed to the sea as if she were sailing along the coast, exposed to the full force of the open sea, and to all winds, excepting winds off shore.

*R. Choate & W. Tilton,* for the plaintiff. At the expiration of the year, the Waterwitch was still in a state of peril on account of the peculiar character of Ypala, was engaged in a voyage which had begun within the year, and was simply stopping at Ypala in prosecution of that voyage, having cleared at San Blas for New York or Boston, her port of destination. She was at sea as to equipments and men, and in every respect, except that she was at anchor and receiving goods from the shore ; and she was on a voyage. She was therefore "at sea" within the meaning of the policy. *Wood* v. *New England Marine Ins. Co.* 14 Mass. 31. *Bowen* v. *Hope Ins. Co.* 20 Pick. 275. 1 Phil. Ins. § 953. *Union Ins. Co.* v. *Tysen,* 3 Hill, 118. The words "at sea" are used "in contradistinction to arrival in port"; and a ship "on a passage" is "at sea." Shaw, C. J. in 20 Pick. 278, 279. The rule declared by this court as the principle of their determination in 14 Mass. 36, is not *obiter dictum,* and in any view is evidence of what the judges thought to be the law of the Commonwealth, when the clause was recent. The parties have changed the contract from a time policy into a voyage policy for

this particular purpose and to this particular extent. Contracts of insurance are to be construed liberally and largely in favor of the assured. *Pelly* v. *Royal Exchange Assurance Co.* 1 Bur. 349, and *Tierney* v. *Etherington*, there cited. Fletcher, J. in *Nelson* v. *Suffolk Ins. Co.* 8 Cush. 490, 491. Meigs v. *Mutual Marine Ins. Co.* 2 Cush. 453. *Mobile Marine Dock & Mutual Ins. Co.* v. *McMillan*, 27 Alab. 98. Park on Ins. (7th ed.) 49. 1 Marsh. Ins. 311. 1 Duer on Ins. 160, 161, 163. Angell on Ins. 3.

A ship's "port of discharge" means not merely her port of arrival, but where, pursuant to the original intention of the parties to the policy, her cargo is to be delivered. "Port of destination" generally means where the ship breaks bulk for the purpose of unlading her cargo, her place of final and ultimate discharge. The port of destination of the Waterwitch was New York or Boston, according to the terms of the charter party, with the right to stop at Ypala for the beneficial purposes of her voyage. 1 Arnould on Ins. § 175. *Coolidge* v. *Gray*, 8 Mass. 529. *Union Ins. Co.* v. *Tysen*, 3 Hill, 118. *King* v. *Middletown & Hartford Ins. Cos.* 1 Conn. 184, 339.

Ypala is neither a port of entry, nor a port in any legal sense. "Port" at least means a port of safety, if not a home port. Parker, C. J. in 14 Mass. 35, 36. It is a place where there are custom-house officers; a place where goods are imported; in the language of the Roman law, *Locus conclusus quo importantur merces et unde exportantur;* a haven, and something more. 2 Chit. Com. & Manuf. 2. Bouvier Law Dict. "Destination"; "Port." "A port," says Lord Hale, "is *quid aggregatum*, consisting of somewhat that is natural, viz. an access of the sea whereby ships may conveniently come, safe situation against wind, where they may safely lie, and a good shore where they may well unlade; something that is artificial, as keys and wharfs and cranes and warehouses and houses of common receipt." Hale *de Portibus Maris, c.* 2, Hargrave's Law Tracts, 46.

The case of *Hutton* v. *American Ins. Co.* 24 Wend. 330, and 7 Hill, 321, is distinguishable from this; for St. Thomas, the port there in question, was a port of safety, and within easy communication; the assured at the expiration of the year knew that

his ship was there, and might have so informed the underwriters; and no final port of destination was fixed.

*R. Fletcher & S. E. Sewall,* for the defendants.

These cases were decided in February 1860.

DEWEY, J. In the case of *Gookin* v. *New England Mutua. Marine Ins. Co.,* the question is whether the policy on the' Water-witch was in force on the 1st of June 1855. It is contended, on the part of the plaintiff, that the conditional extension of time covers the vessel during the entire round voyage, to her return to Boston, and that she would be " at sea" until her arrival at such final port, no matter how many intermediate voyages from port to port she might have made after the expiration of the year. On the other hand, on the part of the defendants, it is insisted that if the vessel was at the expiration of the year in any port, or if then at sea, whenever she should return into port, although it was an intermediate port to which she had resorted for any purposes of the voyage, the conditional extension of the time beyond one year was of no further effect.

The general character of this policy would seem to be that of a time policy. As such it has the privilege of greater latitude in the voyage, and freedom of risk from loss of insurance by deviation or change of purpose as to the particular ports to be visited. But with these benefits there comes also the inconvenience of the limitation of time stated in the policy, which may expire before the contemplated round voyage has been fully accomplished. The distinction between the two classes of policies, those on time and those for a round voyage, is well recognized, and may perhaps throw some light upon the inquiry whether this policy was to continue until the whole voyage was completed and the vessel moored in safety on her final return to her home port in the United States. As an original question, the proper view to be taken of this policy, as it seems to us, would be to consider it as a time policy, intended by the parties to continue one year, and then to expire, wherever the vessel might be at the expiration of that time, if then in port anywhere; and that the stipulation to continue longer than a year, if then at sea, must naturally be taken to be a provision of a limited

and temporary character, defeasible on her return to a port, and not one that would give the policy the indefinite duration attaching to a policy for a round voyage.

The plaintiff relies upon the case of *Wood* v. *New England Marine Ins. Co.* 14 Mass. 31, as decisive of the present case. The broad doctrine is stated in the opinion of the court delivered in that case, that a vessel is " at sea " within the meaning of that clause in the policy, " while on her voyage and pursuing the business of it, although during a part of the time she is necessarily within some port, in the prosecution of her voyage." To that case as an authority, it is objected however that the facts thereof well authorized the plaintiff to maintain his action, independently of any such doctrine as was stated in the opinion of the court and now relied on as an authoritative adjudication of the present question. Its value as an authority for the present case must depend very much upon the precise question there presented and necessarily arising upon the facts. The policy in that case was for twelve calendar months, from the 30th of December 1806, with this memorandum at the foot of the same: " Should this vessel be at sea at the expiration of the above period, the risk is to be continued until her arrival at a port of discharge." The question which seems to have received the more full consideration of the court was that as to the liability of underwriters for a loss arising from an alleged violation of the Milan decree. It appeared that the vessel was in the port of Bristol from the 25th of December 1807 to the 20th of January 1808, having been captured by a British private armed ship, and carried there by her captors, under pretence that she was bound to an enemy's port. The vessel proceeded to sea from Bristol on the 20th of January 1808, and was subsequently captured by a French privateer. The court held, that the clause of the policy, above quoted, continued the policy, though the vessel was at the expiration of the year in the port of Bristol, having been brought there by a private armed ship against the will of the master, so that, a loss having occurred on her voyage from Bristol to Amsterdam, her original port of destination and discharge, the insurers were liable. The case presented this peculiar feat-

ure, which does not exist in the present case, that the vessel was by an armed force carried into port, against the will of the master. The only port to which she had arrived, and which could be said to have taken her case out of the condition of a vessel "at sea," was this port of Bristol, to which she had been wrong- ·fully carried by superior force. But the extension, in case she was at sea, was to continue "until her arrival at a port of discharge," and Bristol was not her port of discharge. That was Amsterdam, and she was lost by one of the perils insured against, before reaching Amsterdam. The case was therefore one directly falling within the condition of being "at sea," on her direct voyage from Beverly, her place of departure, and if her putting in and stay at Bristol was, by reason of its being by an armed force and against her will, to be considered as the termination of the voyage, or arrival at a port of discharge, the plaintiff might well be entitled to recover on his policy. No such question arose as whether, under that policy, the underwriters would have been liable for a loss occurring on a return voyage from Amsterdam, commenced after the expiration of the year. The vessel never reached Amsterdam, her first and intermediate port of destination. The only point therefore required to be decided in that case, was whether the vessel, not having reached Amsterdam within the year, and having been in a port only as carried there by force by a British private armed vessel, was, within the meaning of the policy, "at sea" at the expiration of the year. Assuming the putting in and stay at Bristol to be an act for which the assured was not responsible, and not affecting the policy, the case was clearly for the plaintiff as to the duration of the risk, and this without deciding the further question now raised. Upon the more general question, the subject of the present inquiry, no authorities were cited. Indeed, the ground taken by the plaintiff's counsel would seem to have been merely that while under this illegal seizure and detention, and the consummation of her voyage to Amsterdam having been thereby prevented, such detention and carrying into a port would not be an arrival at a port of discharge, within the con templation of the parties to the policy. The cases, cited by the

counsel on that hearing, of *Scott* v. *Thompson*, 1 New Rep. 181, and *Robinson* v. *Marine Ins. Co.* 2 Johns. 89, were only to that point.

No authority, it is believed, could then or can now be found to support the broad proposition contended for by the plaintiff, unless it be the case of *Wood* v. *New England Marine Ins. Co.* above cited. We look in vain for any English cases bearing upon the subject. Our own case of *Bowen* v. *Hope Ins. Co.* 20 Pick. 275, furnishes no authority for this doctrine. The case of *Wood* v. *New England Marine Ins. Co* was referred to in the opinion pronounced in that case, but merely as a case where it had been decided that a vessel might be deemed " at sea " while on a foreign voyage, though the vessel had been captured and detained in a foreign port, and was so detained until after the expiration of the year, and her voyage to her port of destination and discharge delayed thereby; and that, upon resuming her voyage after the year, she might be considered as entitled to all the privileges of being " at sea " during her illegal detention. The case of *Bowen* v. *Hope Ins. Co.* was this: An insurance was effected to the amount of $5000 on the brig " at and from Boston, to and at all ports and places to which she might proceed, for one year from the 6th of October 1834, and if the vessel should be at sea when the year expired, then the risk was to continue until her arrival at her port of destination and discharge." *
The vessel on the 22d of June 1835 sailed for Rotterdam, from which place she was to proceed to Bangor, in Wales, for a cargo of slates, and thence to Boston; and on her return passage from

---

* The language of the policy is thus given in the report in 20 Pick. 275. But in the original policy on file it is as follows: "At and from Boston to all ports and places to which she may proceed, for one year; commencing the risk on the seventh day of October 1834 at noon, and ending on the seventh day of October 1835 at noon. If at sea when the year expires, then the risk to continue until her arrival in port, at a *pro rata* premium." In the case of *Bowen* v. *Merchants' Ins. Co.* argued and decided at the same time, the language was " at and from Boston to and at all ports and places for one year from the sixth day of October 1834 at noon ; and if on a passage when the year expires, the risk is to continue until her arrival at her port of destination and until discharged, at same rate of premium."

Bangor to Boston, she sustained damage by perils of the seas, for which the action was brought. The defence was, that the vessel was at Bangor at the expiration of the year. It was conceded that she was there and in prosecution of her voyage, and with the intention of proceeding on the same. On the 25th of September 1835, she had dropped down several miles below Bangor, but was detained by head winds and came to anchor, and did not actually get to sea until the 8th of October, after the year had expired. The question argued and decided was, whether the vessel had sailed or commenced her voyage from Bangor previously to the 8th of October; and the court held that enough was done to put the vessel "at sea" within the terms of the policy, before the expiration of the year.

This question was directly considered by the supreme court of New York, and subsequently by the court of errors, in the case of *Hutton* v. *American Ins. Co.* reported in 24 Wend. 330, and 7 Hill, 321. It was a suit upon a time policy on the brig Champion, for twelve calendar months, commencing on the 21st of January 1835, and "if at sea at the expiration of the term, the risk to continue at the same rate of premium until her arrival at the port of destination." She sailed from New York, intending to proceed to St. Barts and Curacoa, and then return to the United States. After landing at those places, she went to St. Thomas for the purpose of taking in her cargo, where she arrived on the 6th of January 1836, and remained there until the 22d of January, being necessarily detained during that time for repairs. She then commenced taking in a cargo, and sailed from thence for New York on the 30th of January, but was stranded and left on the voyage. It was held by the court of errors, that she was not "at sea" when the time specified in the policy expired, but in a port of destination, and that the underwriters were therefore discharged. It was there contended on the part of the plaintiff, that the parties must have contemplated the home port as the port of destination; that the provision "if at sea" at the end of the year, then to continue until her arrival at the port of destination, was intended to afford protection to the vessel until her arrival at her home port in New

York; and that during the whole period of her absence in the prosecution of her trading voyage the vessel was "at sea" within the true meaning of the policy, including as well the time of her detention in port as the time of her sailing on the high seas.   It appeared, in that case, that the vessel had made her arrangements for returning to New York, and was contracting for freight before the year expired.   In that case, it was held by both those tribunals, that such policy would expire by its limitation whenever the vessel was at an intermediate port after the expiration of the year, and the term "if at sea" did not extend the policy to her arrival at her home port of destination. Chancellor Walworth, in giving his opinion, says: "The term 'at sea' is necessarily placed in contrast with a port of destination." " Her last port of destination, when she was at sea, after she left Curacoa, was St. Thomas, for she intended to go there for the argo of coffee."   " Upon such a construction " as the plaintiff contended for, " if the brig had been at Baltimore on the 21st of January 1836, she might have taken in a cargo upon the usual trading voyage by the way of Cape Horn and the Pacific to the East Indies or China, and back by England to New York.   In fact, there would be no termination of the risk until the vessel was actually lost, or was sold by the assured, so long as she continued to carry freight from port to port without returning to New York, where it is said the plaintiff resides." 7 Hill, 325, 329.   In answer to the case of *Wood* v. *New England Marine Ins. Co.* which was cited to the court as a decision upon that question, the chancellor says, " The actual decision cannot well be questioned, though the language of the judge who delivered the opinion of the court went much further than was called for by the facts in the case, or the terms of the policy."   " The loss occurred before she reached her port of discharge."   " But if Amsterdam was intended to be a port of discharge of that vessel, and the twelve months had expired after she had arrived in safety at that port, I cannot concur in the opinion of the learned chief justice, that the terms of the policy would have continued the risk until the return of the vessel to the port from whence she last sailed in the United States."

**7** Hill, 327, 328.    In the same case in the supreme court, it was held that " at sea " was used in opposition to being in port, and arriving at " the port of destination " meant any port of destination, whether at home or abroad, for lading or discharge, or any other object or business voluntarily pursued.    24 Wend. 336.

In *Eyre* v. *Marine Ins. Co.* 6 Whart. 247, the supreme court of Pennsylvania, in a case where the vessel was insured " for and during the term of twelve calendar months, ending on the 10th day of November 1838, with liberty of the globe, and if at sea at the expiration of said twelve months, the risk to continue at the same rate of premium until her arrival at her port of destination in the United States," held, that upon a proper construction of the terms of the contract, the underwriters were not liable after the expiration of the year, unless the vessel was in fact on her voyage to her port of destination in the United States; that it was a contract for a limited period, and extended beyond the year only in case the vessel was at sea on her voyage to a port in the United States.    The vessel had sailed on a voyage from Rio Janeiro in South America to the Island of Jersey in the British Channel, leaving on the 9th of October, and being at sea on the 10th of November 1838, and afterwards, while at sea on this voyage, suffered the damage for which the action was brought.    The court says, that the plaintiff's construction strikes time out of the agreement, and if the intention of the parties had been as alleged by the plaintiff, no period of time should have been introduced, as it has no effect. This case differs from those we have been considering, and limits more strictly the privilege of the ship if " at sea," as she was in fact " at sea " on the day the policy expired, but as the court held, on a voyage without the terms of the contract.    This case subsequently was again before the court, upon the question of the competency of evidence of usage among merchants and insurers, that a voyage described as this was in the policy was understood to be an insurance that would cover a voyage from a foreign port to another foreign port, which had been commenced within the year; and it was held that such evidence of usage was competent.    5 W. & S 116.    The usage there offered to be

shown does not however reach the present case. It was only to show that a vessel might be " at sea " at the expiration of the policy, if then sailing to a foreign port. This the defendants do not deny, but say that after reaching that foreign port in safety after the year, or when she is actually in such foreign port at the expiration of the year, the limitation takes effect.

That the term " port of destination" is applicable to any foreign port at which a vessel may have arrived in the course of her voyage. is clearly recognized in various cases where the subject of seamen's wages has arisen. *Millot* v. *Lovett*, 2 Dane Ab. 461. *Thompson* v. *Faussat*, Pet. C. C. 182. *Giles* v. *Brig Cynthia*, 1 Pet. Adm. 203. *Blanchard* v. *Bucknam*, 3 Greenl. 1.

The supreme court of New York in *Union Ins. Co.* v. *Tysen*, 3 Hill, 118, in a case of a stipulation for extending the policy, " if at sea, until the arrival of the vessel at her port of destina tion in the United States," had held that the language fixed th port of destination to be the home port in the United States. The case of *Hutton* v. *American Insurance Co.* 7 Hill, 330, did not, so far as I learn, question the character of such a policy, while it gave an entirely opposite construction to a policy like that in the present case.

We have no doubt the policy might have been so drawn as to cover the risk incurred during the whole voyage and return to the home port, notwithstanding the vessel might have been at an intermediate port at or after the expiration of the year. But in such case it would much more resemble a voyage policy than a time policy, and time might as well be stricken out of the policy. Here the policy was one with the time of its duration limited to the period of a year. It is true that there was a condition, but this should be read as a condition adapted to a time policy. There is really no limitation, if it be not the first arrival of a vessel from sea in any port after the expiration of the year. Giving it this construction, you leave it a time policy with the reasonable condition, and one suitable and proper, to give opportunity for learning as to the state of the ship and procuring new insurance, or, if lost on a voyage not completed by her return to a port, of charging the loss upon the insurers, without any em

barrassment in fixing the precise day of the loss, and showing that it was previous to the expiration of the year. As it seems to us, the proper construction of the policy in the present case is, that if the vessel was, at the expiration of the year, in any port, or if then at sea, whenever she should return into port, although it was an intermediate port to which she had resorted for the purposes of the voyage, the conditional extension of the time beyond one year ceased to have any further effect; and that such policy could not cover losses occurring at any period subsequent, or the vessel be considered at sea at all times until her return to her home port.

The further inquiry is, Was the Waterwitch at an intermediate port of destination on the 27th of May 1855, when the year expired? She arrived at Ypala on the 19th of May, commenced taking in her cargo on the 21st of May, and proceeded in the business of loading till the 30th of May. She went there voluntarily, and under the charter party by which she was to go to Ypala and there take a full cargo of Brazil wood. This was the situation of the vessel when the year named in the policy expired. But it is said, on the part of the plaintiff, that Ypala is not a port of entry, nor a port in any legal sense, not a haven, not a port, as described by Lord Hale. It is conceded that it is not a port of entry and clearance, and has no custom-house; that there is no haven or harbor there; and that that part of the coast, where Ypala is situated, lies open to the sea. In the charter party it was described thus, "getting a license to load Brazil wood at Ypala, to proceed to the latter port or place, and there to take a full cargo of Brazil wood." It is a place of trade for Brazil wood, and vessels proceed and stop there for this purpose. The evidence tends to show that Ypala is often called a port. It was so called in the protest in the present case, certified by the local judge. The question recurs, whether Ypala was, within the meaning of the policy, a port of destination. Was the Waterwitch "at sea" during the eleven days she was lying at Ypala, taking in her loading?

To some purposes, certainly, a usual place of stopping for

loading or obtaining a cargo is a port of destination. To some purposes the term port has in policies of insurance been held broad enough to embrace the case of vessels loading and unloading in an open roadstead, as in *Cockey* v. *Atkinson*, 2 B. & Ald. 460. In the case of *De Longuemere* v. *New York Fire Ins. Co.* 10 Johns. 120, the court held that the term port might be properly applied to places resorted to and used for the purposes of loading and unloading cargoes, although they were mere open roads, having no harbors.

In the present case, the Waterwitch had certainly reached her port of destination. She had previously obtained a license to proceed to Ypala, and had accomplished that purpose. She was making no voyage, but was at rest at the place sought, and accomplishing the purpose of her voyage to Ypala, taking in a cargo of Brazil wood at her leisure. She had been so situated for eleven days, the last four of which were after the expiration of the year.

It is said however that she merely stopped on the way at Ypala, in the prosecution of a voyage to New York. This might have been equally true if Ypala had been to all intents and purposes a legal port, and an unquestionable intermediate port of destination. It would have been equally true if the vessel had been lost at San Blas, which is conceded to be a port.

This policy, it is to be remembered, was a time policy, expiring by its own limitation in one year, to be extended further only " if at sea on the expiration of the year." If she would not have been at sea, within the meaning of the policy, had she been at the port of San Blas at the expiration of the year, was she any more so when lying at her place of destination for taking in her cargo, at which place she had arrived eight days before the expiration of the year, and had continued there several days subsequent to that period ?

Upon the facts as stated by the case presented by the parties, the court are of opinion that the defendants are not liable for a loss occurring to the vessel on the 1st of June 1855; that the condition upon which the extension of the policy was to take

effect is not shown to have existed, the vessel not being at sea at the expiration of the year.*

The case of *Cole* v. *Union Mutual Ins. Co.* is directly within the principles just settled in the case of *Gookin* v. *New England Mutual Marine Ins. Co.* We have already decided in that case, that " her port of destination," as used in the policy, does not extend the risk necessarily to her arrival at her final or home port of destination, but that it will be terminated upon her voluntary arrival at a port of destination abroad, or intermediate port of destination. The facts in the present case show that the William Penn was at the Chincha Islands on the 7th of April 1855, and there remained until the 14th of June, the year having expired on the 20th of May, and previously to her sailing from such islands. The Chincha Islands constituted at that time, for the purposes of the voyage, the port of destination of the vessel, while thus remaining there for a period of more than two months, taking on board from time to time her cargo. Although there was no custom house, and no clearance could be obtained there, she was, in reference to the condition in the policy as to the extension of the same beyond the year, not " at sea," and not entitled to the benefit of the extension of the time secured thereby to vessels " at sea " at the end of the year.†

*Judgments for the defendants.*

---

* A like decision was made at the same time in the precisely similar case of STEPHEN TILTON & others *vs.* TREMONT MUTUAL INSURANCE COMPANY, argued by *R. Choate & W. Tilton*, for the plaintiffs, and *C. W. Loring*, for the defendants.

† A like decision was made at the same time in the case of JOHN COLE & others *vs.* COMMERCIAL MUTUAL MARINE INSURANCE COMPANY OF NEW BEDFORD, argued by the same counsel, upon similar facts, in which the words of the policy were as follows : " "At and from Boston May 20th 1854 at noon to, at and from all ports or places she may go to or touch at during the term of twelve calendar months, commencing the risk on the aforesaid 20th day of May at noon, and ending the same on the 20th day of May 1855 at noon, to be continued, in the event of her being then at sea, at a *pro rata* premium until she reaches her port of destination."